## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

Randall Johnson, Jr., Administrator of the
Estate of Sasha Garvin,

                *Plaintiff*,

v.                                              **Case No. 3:19-cv-054**
                                              **Judge Thomas M. Rose**

NaphCare, Inc., *et al.*,

                *Defendants*.

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS BRENDA ELLIS, M.D., APRIL MERKT, GREG MILLS, PAMELA MITCHELL, R.N., NAPHCARE, INC., DARRELL RADER, R.N., DOC. 64, AND DENYING MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS THE MONTGOMERY COUNTY BOARD OF COMMISSIONERS, ROBERT STRECK. DOC. 65. THE COURT ALSO GRANTS PLAINTIFF'S MOTION TO QUASH SUBPOENA ISSUED TO JOHNNY BATES, M.D., DOC. 82.**

---

Pending before the Court are Motion for Summary Judgment by Defendants Brenda Ellis, M.D., April Merkt, Greg Mills, Pamela Mitchell, R.N., NaphCare, Inc., and Darrell Rader, R.N. Doc. 64 and Motion for Summary Judgment by Defendants Montgomery County Board of Commissioners, and Robert Streck. Doc. 65. Movants request that the Court award them summary judgment on all counts of Plaintiff's First Amended Complaint. Doc. 1-1. These motions assert similar arguments. Plaintiff does not oppose summary judgment on Plaintiff's fourth and fifth claims, and summary judgment will be granted on these claims. Because Plaintiff has evidence of

deliberate indifference causing death to an inmate at the Montgomery County Jail, these motions will be denied in all other respects. Because discovery is closed, Plaintiff's Motion to Quash Subpoena Issued to Johnny Bates, M.D., Doc. 82, will be granted.

The Complaint names as Defendants: NaphCare Inc, April Merkt, Greg Mills, Brenda Ellis, M.D. Pamela Mitchell, R.N., Darrell Rader R.N., Robert Streck as Sheriff of Montgomery County, Ohio, and the Montgomery County Board of Commissioners, who are sued in their official capacities. Doc. 1-1. The first claim asserts medical negligence against NaphCare, Merkt, Mills, Mitchell, Rader, and Ellis, Doc.1-1, PageID 7; the second claim asserts wrongful death against the same defendants; the third survivorship; and the fourth breach of fiduciary duty. In the fifth, NaphCare is charged with negligent hiring and supervision. PageID 11. In the sixth, deprivation of constitutional rights, deliberate indifference to a serious medical need in violation of 42 U.S.C. §1983 is asserted against all defendants. PageID 12. The seventh cause of action asserts failure to supervise, failure to train, and failure to discipline in violation of 42 U.S.C. § 1983 against NaphCare, the Sheriff, and the Montgomery County Board of Commissioners. PageID 14.

## I.    Background

On May 9, 2017, Sasha Garvin was arrested by the Riverside Police Department on a warrant for driving without a license and possession of drug paraphernalia, a misdemeanor. She was booked into the Montgomery County Jail at 9:34 a.m. At the time of her booking, EMT Chad Rowland completed a Comprehensive Detox Screen and noted that Garvin was not exhibiting any opiate withdrawal symptoms. (Ex. 20, NC000053-NC000061, PageID 2236-#2244). Rowland entered on the Montgomery County Jail drug screening document that is called the Clinical Opiate

Withdrawal Scale, or "COWS" scale, that Garvin was undergoing minimal withdrawal symptoms.

(Ex. 20, NC000050, PageID 2233). Further COWS evaluations were recorded as follows:

> May 9, 2017 at 1:15 p.m. Shante Miliner LPN completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000047, PageID 2230).

> May 10, 2017 at 3:56 a.m. Jeffrey Harger R.N. completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000044, PageID 2227).

> May 10, 2017 at 12:05 p.m. Ashley Cox LPN completed a COWS screen a reported a total COWS score of 0. (Ex. 20, NC000041), PageID 2224).

> May 10, 2017 at 7:30 p.m. Darrell Rader RN completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000038, PageID 2221). Garvin did not appear to be having any active withdrawal symptoms at that time. (Depo. Rader, at 44, PageID 3071).

> May 11, 2017 at 3:50 a.m. Jeffrey Harger RN completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000035, PageID 2218).

> May 11, 2017 at 8:00 p.m. Kelly Spencer LPN completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000032, PageID 2215).

> May 12, 2017 at 1:53 a.m. Jeffrey Harger RN completed a COWS screen and reported a total COWS score of 0. (Ex. 20, NC000029, PageID 2212).

> May 12, 2017 at 8:59 a.m. Chauntae Oliver LPN completed a COWS screen and reported a total COWS score of 0. (Ex., NC000026, PageID 2209).

No COWS screens were performed after that date. On each and every screen, Garvin's score was

negative for signs of withdrawal from drugs. Garvin's date of entry was May 9, and, consistent

with policy, she was checked for withdrawal for three consecutive days. (Depo. Ellis, at 168, PageID 2120)

On May 17, 2017 at 9:26 p.m., Darrell Rader, R.N. performed a physical assessment on Sasha Garvin. (Ex. 20, NC00020-000025, PageID 2203-2208). During the course of the examination, nurse Rader noted that Garvin had a history of Crohn's and gastric bypass. (Ex. 20, NC000024, PageID 2207). Nurse Rader testified in his deposition that at the time of the history and physical, Garvin did not appear to be going through any withdrawal symptoms. (Rader depo., pp. 59-60, PageID 3086-3087).

Later that evening at 11:34 p.m., Sasha Garvin was seen by Greg Mills, LPN because she was complaining of abdominal pain. She told nurse Mills that she was having a Crohn's flare up and needed to go to the hospital. He performed no physical examination. (Depo. Mills, po 86-87, PageID 1573-1574). Nurse Mills started Garvin on pain protocol and gave her two Tylenol and a couple of ice packs. (Depo. Mills, pp. 84-86, PageID 1571-1573). He advised her to submit a sick call request if her symptoms did not improve. (Ex. 20, NC000064, PageID 2247).

Corrections Officer Tiffany Cornely was coming on duty when Sasha Garvin was being brought back up from medical. Garvin went to bed and Cornely did not see her until she heard her up in the bathroom and vomiting. Garvin told Cornely that she was having stomach pain and vomiting and could not stop. Garvin said she needed to go to the hospital for the pain. (Depo. Cornely, pp. 12-14, PageID 486-488).

Cornely saw Garvin vomiting and asked her if she was detoxing from drugs. Garvin advised her she was not detoxing and that she believed it was due to a Crohn's flare up. Cornely called medical again and they told her that Garvin had just been seen at shift change and there was

4

nothing they could do for her. She needed to put in a "kite" to be seen the next day. (Depo. Cornely, pp. 15, 17-18, PageID 489, 491-492). Medical advised Cornely that they refused to see Garvin because she had just been seen. (Depo. Cornely, at 20, PageID 494). Garvin continued to vomit and Cornely finally took her back down to medical for her continued vomiting and stomach pain. She did not see her after that. (Depo. Cornely at 26, PageID 500).

On May 18, 2017 at 2:35 a.m. Sasha Garvin's vital signs were taken . Her blood pressure was 104/74, her pulse was 58 (having dropped from 96 at 10:34 p.m.) (Ex. 20, NC000017, PageID 2200) and she reported pain of 10/10. In a late entry note dated 5/18/17 at 6:03 a.m., nurse Greg Mills reported in a note that corresponds with the vital signs that he had been called to the POD because she was complaining of pain of 10/10 and she had a drop in pulse. He stated in his note that she was very cold and clammy and that when he had previously seen her, her skin had been warm and dry. He measured her blood sugar level, and it was 154. Mills noted her bowel sounds to be hypoactive in all quadrants and she pointed to pain in her upper stomach.

Dr. Brenda Ellis was called and she ordered medication and a urinalysis. Garvin was moved to first floor observation. (Ex. 20, NC000018, PageID 2201). Greg Mills, LPN testified that he has the authority to transfer a patent out to an emergency room or a hospital. (Depo. Mills, pp. 36-37 PageID 1523-1524). Garvin asked nurse Mills to send her to the hospital; the corrections officer asked Mills to send Garvin to the hospital, but Mills did not feel it was necessary and never gave an order to send her to the hospital. (Depo. Mills, pp. 118-119, 147 PageID 1605-1606, 1634).

Brenda Ellis, M.D. issued orders for Ciprofloxacin HCI Oral 500 mg. (antibiotic) twice a day; Dicyclomine HCI Oral 20 mg. (for irritable bowel syndrome stomach cramping) twice a day;

and Ondansetron HCI Oral 4 mg. (for pain) twice a day. Mills administered these medications on May 18, 2017 at 3:43 a.m.

Dicyclomine should not be given to patients with bowel obstruction or gastric obstruction and gastroesophageal reflux disease. (Doc. 72-2, Johnny Bates report). Crohn's disease can increase the risk of bowel obstruction and pain is one of the presenting factors. (Depo. Ellis, pp. 131, 136, PageID 2084, 2088).

Dr. Ellis never personally saw Garvin but is aware that her receiving record indicated she had a history of a gastric bypass and of Crohn's disease. (Depo. Ellis, pp. 137, 142, PageID 2089, 2094). She is unsure if nurse Mills advised her of the Crohn's disease when he called her; he did tell her that Garvin had severe abdominal pain, but he also told her that Garvin's vital signs were stable. (Depo. Ellis at 142, 150-151, PageID 2094, 2102-2103). Ellis only had one conversation with nurse Mills and based on the symptoms he provided to her, she did not suspect a volvulus or bowel obstruction. (Depo. Ellis, pp. 163, 180, PageID 2115, 2132).

Plaintiff's expert, Johnny Bates, M.D. further opines in his report that it is well known that a small bowel obstruction can occur in a patient who has a medical history like Garvin. Bowel obstructions can be life threatening and would require more testing than can be performed in the jail. (Depo. Ellis, pp. 126-127, PageID 2078-2079). Dr. Ellis testified that if she suspected a bowel obstruction, which symptoms can include bloating, vomiting, abdominal pain, distention, diarrhea, and constipation, the standard of care would be to send the inmate to the hospital. (Depo. Ellis, at 130, PageID 2082).

Dr. Ellis did not make any arrangements to see Garvin and did not give any order to have her transported to a hospital. (Depo. Ellis, pp. 167, 172, PageID 2119, PageID 2124). Per Dr. Ellis'

orders, Mills rechecked Garvin at 5:07 a.m. and noted that her vital signs remained stable and that she continued to report her pain level as 10/10. (Ex. 20, NC00017, PageID 2200).

Dr. Ellis did not reassess her abdomen, document her pain, or determine whether she was vomiting. Expert Bates opines that this is a violation of policy and standard nursing procedure that would have dictated a more thorough assessment and documentation. (Doc. 72-2, Johnny Bates report). No vital signs were taken after that time until she was found dead in her cell on May 19, 2017.

Medical staff advised Corrections Officer Cornely that Garvin was being placed in medical observation so Cornely listed her as "out on appointment" at 5:28 a.m. on May 18, 2017. (Depo. Cornely, pp. 29-30, PageID 503-504).

On May 18, 2017 at approximately 1:00 p.m. Sasha Garvin appeared in the Montgomery County Municipal Court. Garvin's daughter, MaKayla, attended the court appearance with her father, Randal Johnson, Sr. Johnson noted that Garvin was sick, that she was doubled over, and they had to give her a waste basket. (Depo. Johnson, pp. 36-37, PageID 1724). Garvin was returned from Court at 4:09 p.m. and instead of being placed in medical observation, was returned to female hold cell 122, located in North 21.

Corrections Officer Brianna Stafford returned Garvin to the jail. (Depo. Cornely pp. 47-48, PageID 521-522, Parin Risk Management Report, PageID 782-790; Depo. Stafford at 27, PageID 1003). Stafford testified in her deposition that when an inmate is placed on medical observation only NaphCare can remove the inmate from observation and if an inmate is taken out to court they should be returned to medical observation. (Depo. Stafford at 21, PageID 997). Stafford went on to testify that Garvin should not have been taken back to North 21 unless there

was a specific order from NaphCare releasing her. (Depo. Stafford, at 30, PageID 1006). There was no such order, but Stafford returned Garvin to North 21 instead of medical observation. Dr. Ellis thought Garvin would stay in medical observation until she was rechecked and until the medical personnel indicated corrections could send her back to regular housing. The records don't reflect that was ever done. (Depo. Ellis, pp. 157-160, PageID 2109- 2112). No one took Sasha Garvin off medical observation when she returned from court. (Depo. Parin, at 39, PageID 734).

On May 18, 2017 at 3:00 p.m., April Merkt, L.P.N. noted that she was unable to see Garvin during her watch and would advise the next watch to see her. (Ex. 20, NC000018, PageID 2201). Nurse Nichole Hochwalt gave medications ordered by Dr. Ellis on May 18, 2017 at 8:07 p.m. No medications were given to Sasha Garvin after that time. Just before shift change on May 18, 2017, Garvin told Corrections Officer Nicole Sessoms she was in extreme pain. Corrections Officer Sessoms contacted medical and took her down. (Depo. Sessoms, pp. 19-20, PageID 809-810). Sessoms wanted to be sure that Garvin wasn't put in a medical wait because she has seen inmates put in medical wait and then forgotten about, so she waited to be sure a nurse was with Garvin before she left. (Depo. Sessoms, pp. 21-22, 24, 26 PageID 811- 812, 814, 816).

Garvin was brought to medical just as Darrell Rader, R.N. was leaving and was seen by April Merkt, LPN. She had abdominal pain and Rader believed that April was going to give her a urinalysis. (Depo. Rader, pp. 78-79, PageID 3105-3106). On May 18, 2017 at 11:25 p.m. April Merkt, LPN placed Sasha Garvin on the first floor for medical observation and indicated she would check her in one hour and report findings. (Ex. 20, NC000018, PageID 2201). Merkt never saw Garvin while she was in Female Cell 122. (Depo. Merkt, at 152 PageID 1265). She did not perform any type of physical examination and took no vital signs. (Depo. Merkt, at 141, 151 PageID 1254,

#1264). Sasha Garvin was not checked by any person at NaphCare after she was placed in Female 122.

At the time she saw her, Merkt wished to obtain a urine sample and Garvin was unable to provide it. Merkt gave Garvin a specimen cup and specifically advised Corrections Officer Sessoms that Garvin was to be placed in a cell by herself for that reason and that medical should be advised as soon as the sample was provided. (Depo. Merkt, at 104 PageID 1217). To Merkt's knowledge, Garvin was in a cell by herself trying to give a urine sample. (Depo. Merkt, at 124 PageID 1237). Merkt requested that Garvin be placed in a cell by herself so there was no confusion with regards to the urine sample. (Depo. Merkt at 191 PageID 1452).

Female hold cell 122 is designed for one person. (Depo. Parin, pp. 63-64, PageID 758-59). There were three inmates in the cell including Garvin, Kirby, and Claxton. No one from NaphCare ever checked on Sasha Garvin . (Depo. Merkt, at 194 PageID 1455).

Sergeant Thomas Feehan was the sergeant on duty for the First Watch on May 19, 2017 and is ultimately responsible for the inmates housed on the first floor. (Depo. Feehan, pp. 15-16, PageID 559-560). Sgt. Feehan does walk-throughs but usually lets his officers handle the female inmates. (Depo. Feehan, at 26, PageID 570). When Sgt. Feehan came on duty he was told that Garvin was in female hold 122 for medical observation. (Depo. Feehan, at 19, PageID 563). Sgt. Feehan spoke to another officer early in his shift and was told that the inmates in Female Hold 122 were "dope sick." When Feehan later saw Garvin lying on the floor dry heaving and coughing and assumed that she was dope sick. (Feehan depo. pp. 10-13, PageID 554-557). He did not go back after that and has no idea if any of the other officers did. (Depo. Feehan, at 30, PageID 574). Feehan testified that there were other inmates in the cell who could have summoned officers to

9

assist Garvin, even though he was aware that the other inmates were going through drug withdrawal. (Depo. Feehan, at 28, at 53, PageID 572, PageID 597). One of the inmates, Kirby, was known to be unpredictable (Depo. Sizemore, pp. 49-50, PageID 593-594).

From 1:56 a.m. on May 19, 2017 until 8:13 a.m., although wellness checks were performed, Female Hold Cell 122 (the cell in which Sasha Garvin was housed) was not checked. (See Parin Depo., Ex. 5, Risk Management Review Report, p.8-9, PageID 789-90). On May 19, 2017 at 5:00 a.m., jail staff began passing out trays of food. This was completed by 5:33 a.m. (Ex. 37, MC004046, PageID 3273). On May 19, 2017 at 8:15 a.m. Corrections Officer Linda Thomas was asked by another corrections officer for assistance. When they opened the cell door they found Garvin, who they did not know was there, up against a wall, cold and unresponsive. (Depo. Thomas, at 14, at 22 PageID 1034, #1042 ). NaphCare was called to Female Hold Cell 122 and Sasha Garvin was found to be unresponsive, sitting upright in the corner by the toilet. CPR was started. (Ex. 20, NC000007, PageID 2190). One of the items found in the cell was a urine sample vial. (Depo. Parin, at 28, PageID 723).

The Montgomery County Coroner's Office performed an autopsy on Sasha Garvin and, on June 20, 2017, reported findings that the cause of death of Sasha Garvin was acute small bowel obstruction with acute ischemic enteritis and acute peritonitis due to volvulus of the small intestine, with status post remote gastric bypass procedure and history of Crohn's disease contributing. (Depo. Brenda Ellis, Ex. 17, PageID 2310). Drugs were not a factor in Sasha Garvin's death (Depo. Parin, at 66, PageID 761). More likely than not, had this been diagnosed early in the course of the disease Garvin would have survived. (Doc. 72-2, Bates report; Doc. 72-1, Gabriel Report).

The First Floor of the Montgomery County Jail consists of multiple areas, including the NaphCare Officers, the Medical Observation Cells and the Female Hold Cells including Cell 122. (Sizemore Depo, Ex. 38, PageID 3285). When the medical observation cells are not available, inmates are placed in the female hold cells. (Depo. Thomas, at 19 PageID 1039). Often times the medical cells across from NaphCare are full and the females then go to the female holding cells. (Depo. Feehan, at 18, PageID 562). In 2017 it was common practice for females to be placed in female hold during the midnight shift for medical observation purposes. (Depo. Meyer, at 20, PageID 664). The female hold cells cannot be observed from NaphCare. (Depo. Rader, at 26, PageID 3053, Depo. Cornely, at 31 PageID 505; Depo. Parin, at 18, PageID 713). Female hold cell 122 is on the opposite side of the first floor and not in the same area as the medical offices. (Depo. Meyer, pp. 11-12, PageID 665-666, Depo. Sessoms, at 28, PageID 818). Medical would not hear an inmate from Female hold cell 122 (Depo. Feehan, pp. 28-29, PageID 572-573, Depo. Cornely at 38, PageID 512, Depo. Stafford pp. 14-15 PageID 991-992, Depo. Sizemore, at 22, PageID 890).

If there is a problem in the female hold cells, NaphCare commonly relies on the correction officer or sergeant to notify them. (Depo. Rader, at 28, PageID 3055, Depo. Mills, at 58 PageID 1545). If a corrections officer sees an inmate in any kind of medical distress, they are supposed to alert NaphCare. (Depo. Meyer, at 22, PageID 666). NaphCare staff would not check on a patient in medical observation unless there was an order for them to do so or if there was an emergency. (Dep. Mills, at 54, Depo. Merkt, at 99 PageID 1212). Corrections are responsible for assuring that the patients are beathing and well and unless medical is notified otherwise, the nurses do not respond. (Depo. Merkt, pp. 149-150 PageID 1263-1264).

In Female Hold Cell 122, the door opens from the right to the left and on the left side there is a concrete bench raising approximately four inches off the floor designed for one mat. On the right side of the cell there is a half wall with a toilet and sink behind it. (Depo. Sizemore, at 30, PageID 898). There is a window in the cell that is approximately 3 ft. by 3 ft. and there is a half window on the left side (Depo. Feehan, at 29m, PageID 573, Depo. Meyer, at 25 PageID 669, Depo. Stafford at 17, PageID 997). From the platform a portion of Cell 122 is visible, but not anything around the toilet area. (Depo. Thomas, at 15 PageID 1035, Depo. Feehan, at 30, PageID 574). An inmate is not visible if they were laying down, someone would have to walk up to the door and look in to see them. (Depo. Sessoms, at 31 PageID 821, Depo. Parin, pp. 49-50, PageID 744-45).

If an inmate is housed in cell 122 for more than eight hours, they should have access to a mat and a blanket. (Depo. Meyer at 15, PageID 659). Mats are typically given out by the first floor officer. (Depo. Williams, at 22 PageID 1092, Depo. Cornely, at 41, PageID 515). Female hold cell 122 has one raised concrete bench that is raised approximately four inches off the floor making room for one mat. It is designed to hold one inmate. (Depo. Parin, at 62, PageID 747). The half wall around the toilet area prevents any inmates behind the wall being seen unless their legs are sticking out. (Depo. Meyer, p.27, PageID 671).

Corrections Officer Joshua Sizemore was the first floor officer on duty from 11:30 p.m. to 7:30 a.m. on May 19, 2017 which included Female Hold Cell 122. (Ex. 18, PageID 1895). Officer Sizemore checked in on May 18, 2017 at 11:28 p.m. He completed his armband count and performed his walk through at the same time, finishing at 11:58 p.m. (Depo. Sizemore, Ex. 37 [MC-004046], PageID 3273). At armband count, the correction officers physically check the

12

armbands of the inmates. (Depo. Meyer, at 29, PageID 673). At 5:00 a.m., jail staff began passing out trays of food and that was completed by 5:33 a.m. (Id.) Officer Sizemore completed his shift at 7:29 a.m. on May 19, 2017 and turned over his keys to the next shift.

At 8:15 a.m. NaphCare was called to Female Hold Cell 122 and Sasha Garvin was found to be unresponsive, sitting upright in the corner by the toilet. (Ex. 20, NC00007, PageID 2190). Officer Sizemore was subsequently questioned about his walks by Deputy Wallace as a result of the Montgomery County Coroner's Office stating that Sasha Garvin had been dead for hours before she was found. (Depo. Sizemore, at 7, PageID 875). Sizemore, however, states that he is "almost certain" that he spoke with Garvin when he passed food at 5:30 a.m. and she asked for a milk, even though the coroner indicated the time of death was much earlier. (Depo. Sizemore, pp. 60-61, PageID 928-929).

One of the inmates also stated that Garvin had been dead for a while. (Depo. Thomas, at 26 PageID 1046). Sgt. Thomas Feehan was advised by the Coroner that Garvin had passed a few hours before they found her. (Depo. Feehan, at 25, PageID 569). Sasha Garvin was sitting on the floor behind a wall that obstructed the toilet and in order see her, the officer would have had to have entered the cell. (Depo. Thomas, at 23 PageID 1043).

Montgomery County Sheriff's Office Jail Manual Policy 5.3.1 (A)(9) provides:

> The First Floor Officer(s) visually checks all holding and waiting
> areas, Medical Observation cells and S-1-1 at irregular intervals but
> at least once every sixty 60) minutes and records the wellness check
> on the First Floor Work Station Duty Log.

(Depo. Feehan, Ex. 23, PageID 3269-3271). The checks are to be done as a requirement of the first floor officer per policy 5.3.1, paragraph 9. (Depo. Parin, at 26, PageID 721).

Following the death of Sasha Garvin, Captain Dave Parin investigated the matter and issued his report. (Ex. 5, PageID 782-790). In his report Captain Parin reported the following:

> I reviewed all video from Fem-Wait from 2315 hours on May 18 2017, at 2315 hours, until May 19, 2017 at 0825 hours. During this time I observed correctional staff perform wellness checks in cell 122. . . Of note there are three periods of time where a staff member was not specifically at this cell is from 0156 to 0330, a span of 94 minutes, 0330 to 0530, a span of 120 minutes, and 0530 to 0800, a span of 150 minutes...

Cpt. Parin goes on to state in his report that "although officers assigned to the first floor were in the housing unit every hour, they did not specifically look into cell 122 during the time frame listed above." Doc. 41, PageID 790.

The first floor officer, according to policy is required to walk and check on everybody every 60 minutes to do a wellness check to make sure the inmate is not in any kind of medical or physical distress. (Depo. Meyer, pp. 12-13 PageID 656-657, Depo. Thomas at 29 PageID 1049).

In reviewing Jail Policy 5.3.1(A)(9), it is Officer Sizemore's opinion that the policy is merely a "guideline". (Depo. Sizemore, at 64, PageID 932). Other, more experienced officers, however, opined differently. Corrections officer Craig Meyer with 19 years' experience at the Montgomery County Jail states that, according to policy, you are required to walk and check on every inmate every 60 minutes. (Depo. Meyer, at 12, PageID 656). Corrections officer Linda Thomas who has been with the Montgomery County Sheriff Office since 2005 states that there is a written policy for doing checks of cells every 60 minutes. (Depo. Thomas, at 35 PageID 1055). Captain David Parin who has been with the Sheriff's Office for 28 years testified that the policy is that there is a check of the housing unit every sixty minutes and cell 122 would be under the corrections officers assigned to the first floor. (Depo. Parin, at 19, PageID 714). Corrections

Officer David Williams who has been at the Montgomery County Sheriff's Office for approximately five years testified that hourly walks are done to make sure everybody is ok and that you actually look into the cell to assess the inmate. (Depo. Williams, pp. 18-19 PageID 1088-1089).

Anyone who sees an inmate has a serious injury can call an ambulance. (Depo. Feehan, at 32, PageID 576). In May 2017, Montgomery County was under contract with NaphCare to provide medical services to the Montgomery County Jail (Ex.21, PageID 2635). The contract provided that during the night shift, the jail would be staffed with a registered nurse, a licensed practical nurse, and an emergency medical technician. (Depo. Mitchell, at 26 PageID 1084). On May 19, 2017, the first watch for NaphCare included April Merkt, LPN, Greg Mills LPN, and Jack Saunders EMT. There was no registered nurse on duty as required by contract. (Depo. Merkt, pp. 84-85 PageID 1197-1198, Ex/ 19, PageID 1895).

During 2017 very rarely was there an RN on duty for that shift. (Depo. Merkt, pp. 70-71, PageID 1183-1184). An LPN is not considered an advanced care provider, so an RN is assigned to each shift, so that the RN can take charge. (Depo. Mitchell, pp. 76-77, PageID 1854-1855). The only services that April Merkt was permitted to provide was to take vital signs, give insulin, and do Accu-Checks. (Depo. Merkt, at 51 PageID 1164). Her job duties were very specific. (Depo. Merkt, at 21, PageID 1134). The main duties of Greg Mills LPN, the other nurse on duty, was to enter the medical requests from inmates, known as "kites," into the computer. (Depo. Mills, at 23 PageID 1510).

In May 2017 Defendant Pamela Mitchell, RN, was the Health Services Administrator for NaphCare at the Montgomery County Jail. Mitchell has an associate degree as a registered nurse

and is certified as a psychiatric nurse. (Depo. Mitchell, pp. 7-9 PageID 1785-1787). Mitchell, in her deposition, stated "I'm a psychiatric nurse. I'm really not very good at medical." (Depo. Mitchell, at 40 PageID 1818). Mitchell also had never read the NaphCare policy manual (Depo. Mitchell, at 37 PageID 1815). She is unaware of whose responsibility it is to make sure an inmate's medical record is complete and accurate. (Depo. Mitchell, at 34 PageID 1812). She has no idea of the requirements for checking Sasha Garvin when she was brought for medical observation. (Depo. Mitchell, at 64 PageID 1842). However, she does acknowledge that it is the responsibility of NaphCare to check on patients in medical observation cells. (Depo. Mitchell, at 66 PageID 1844).

NaphCare's own policy states that once patients are placed in observation units:

> 2) The advanced clinical provider will provide orders as to how the inmate should be medically treated, monitored (i.e., vital signs every 30 minutes) and the clinical criterial for notifying the advanced clinical provider or releasing the inmate back to general populations. Vital signs are to be obtained at a minimum of once per shift.

See, Johnny Bates report. The last time Sasha Garvin's vital signs were taken were on May 18, 2017 at 5:07 a.m., some twenty-seven (27) hours before she was found dead in her cell.

Dr. Johnny Edward Bates, M.D., MMM, CPE, CCHP, CCHP-P CPHIMS, Plaintiff's expert, has opined that but for what he describes as deliberate and inhumane treatment, Sasha Garvin would be alive today. He further opined that Dr. Brenda Ellis failed to take her obligations and treat the patient with the duty she was sworn to do and abrogated her responsibility to nurses who are not trained to diagnose and who further fell below the nursing standard of care by failing to provide adequate care and treatment to Sasha Garvin. (Johnny Bates report). Likewise, Dr. Paul W. Gabriel, M.D., F.A.C.E.P, F.A.A.E.M, opined that, "based upon a reasonable degree of medical certainty, had Sasha Garvin been appropriately transferred to an Emergency Department on May

18, 2017, undergone appropriate CT scanning, lab testing, IV antibiotic therapy and emergent surgical intervention, she would have survived." (Gabriel Report).

Plaintiff's expert, Michael A. Berg opined "If a picture of deliberate indifference could be drawn, this is tragically it." (Berg report, at 44). Michael Berg is independent consultant in the field of corrections with over forty-four years of experience in criminal justice management. (Ex. 3).

Garvin's estate filed suit in the Montgomery County, Ohio Court of Common Pleas. On February 21, 2019, the case was removed to this Court. Doc. 1-1, PageID 5. The First Amended Complaint names as defendants: NaphCare, Inc., April Merkt, Greg Mills, Pamela Mitchell, R.N., Darrell Rader, R.N., and Brenda Ellis, M.D., Montgomery County Sheriff Robert Streck, and the Montgomery County Board of Commissioners. The First Amended Complaint asserts seven causes of action: Medical Negligence, Wrongful Death, Survivorship, and Breach of Fiduciary Duty against NaphCare, Merkt, Mills, Mitchell, Rader, and Ellis; Negligent Hiring/Supervision against NaphCare; Deprivation of Constitutional Rights, Deliberate Indifference to a Serious Medical Need Pursuant to 42 U.S.C. § 1983 against all Defendants; and Failure to Supervise / Failure to Train / Failure to Discipline Pursuant to 42 U.S.C. § 1983 against NaphCare, Montgomery County Sheriff Robert Streck, and Montgomery County Board of Commissioners. Doc. 1-1.

## II.    Standard

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## III.  Analysis

Defendants NaphCare, Inc., April Merkt, L.P.N., Greg Mills, L.P.N., Brenda Ellis, M.D., Pamela Mitchell, R.N., and Darrell Rader, R.N., have moved the Court to grant summary judgment in their favor, asserting there is insufficient evidence to establish any of Plaintiff's claims. Specifically, they assert that Plaintiff's medical malpractice, wrongful death and survivorship claims lack evidence that actions of Defendants caused Plaintiff's injury. They also assert Plaintiff's Constitutional claims should be dismissed because plaintiff cannot establish that any of them acted with deliberate indifference to a serious medical need or that the care and treatment fell short of contemporary standards of decency such that it amounted to unnecessary and wanton infliction of pain. In their eyes, they responded to Sasha Garvin's presenting medical conditions, and provided substantial medical care based on her symptoms. They further assert Plaintiff has failed to establish the objective and subjective prongs of a deliberate indifference claim. Next, they assert Plaintiff cannot demonstrate that the care and treatment fell short of contemporary standards of decency or that it amounted to unnecessary and wanton infliction of pain.

As regards the unconstitutional customs, practices or policies claims against NaphCare, Inc., the corporation asserts Plaintiff cannot establish that NaphCare, Inc.'s customs, practices, or policies led to the alleged Constitutional deprivation. The corporation also asserts Plaintiffs cannot establish that NaphCare failed to supervise, train, or correct their employees with respect to the alleged constitutional deprivations. NaphCare and its employees assert Plaintiff's Constitutional and negligence, death and survivorship claims should be dismissed because plaintiff cannot establish that the NaphCare and its employees caused the alleged injury. Finally, the motion also seeks to dismiss Plaintiff's claim for breach of fiduciary duty, asserting Plaintiff cannot establish the elements of such claim.

### A. Medical Malpractice, Wrongful Death, and Survivorship Claims

Plaintiff asserts a claim for medical malpractice against NaphCare and its employees. Under Ohio law an employer may be held liable for the medical malpractice of medical professionals in its employ. *Tisdale v. Toledo Hosp*., 197 Ohio App.3d 316, 331, 2012-Ohio-1110, ¶ 43, 967 N.E.2d 280, 291. A health care provider employed by a government entity to fulfill its duty to provide health care to inmates owes the same duty to provide medical care that the governmental entity owes. See, e.g., *West v. Atkins*, 487 U.S. 42, 54-55, 108 S. Ct. 2250, 2258, 101 L. Ed.2d 40, 53 (1988) (holding that physician contracted to provide medical care at a prison acted under color of state law.) Additionally, under Ohio law, the existence of a provider/patient relationship places a duty on the provider to act as a reasonable provider would in providing medical care to the patient. Ohio Jury Instruction CV 417.03(1). See also *Hinkle v. Cleveland Clinic Found*., 159 Ohio App.3d 351, 372, 2004-Ohio-6853, ¶ 81, 823 N.E.2d 945, 960 (Ohio App. 2004).

19

Thus, the admission of Garvin into the Montgomery County Jail placed a duty on NaphCare and its staff to provide Garvin with medical care within the standard of care, satisfying the first element of medical malpractice. Plaintiff has submitted the reports of medical experts, with experience in both emergency medicine and correctional medicine. Dr. Paul W. Gabriel, M.D., F.A.C.E.P, F.A.A.E.M had been Chairman of the Department of Emergency Medicine at Grant Medical Center in Columbus for over twenty years. (Ex. 1) Dr. Johnny Edward Bates, M.D., MMM, CPE, CCHP, CCHP-P CPHIMS, has nearly thirty years of experience in correctional medicine. Both reviewed the records regarding Sasha Garvin's death. (Ex. 2) Both concluded that, in their opinions, to a reasonable degree of medical certainty, had Ms. Garvin been sent to a hospital, as the standard of care required, she would have timely received the necessary surgery and she would have survived.

Defendants assert that Plaintiff has no evidence of causation. "Cause in fact is typically assessed using the 'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than it did. Conduct is the cause in fact of a particular result if the result would not have occurred but for the conduct. Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result." *Powers v. Hamilton Cnty. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007

NaphCare asserts that neither of Plaintiff's experts is capable of opining that Garvin probably would not have died if she had been transferred to a hospital emergency room on the night of May 18th, after returning from a day in Court. (Motion, at 35, Doc. No. 64, PageID 3202.) NaphCare further argues that, under the holding of *Davis v. United States*, 302 F. Supp. 3d 951,

20

959-61 (S.D. Ohio 2017), Drs. Gabriel and Bates failed to provide the "'how' and 'why'" that they used to determine that the alleged failure to send Garvin to a hospital likely caused her death.

Dr. Gabriel states in his report:

> There were multiple breaches in the standard of care of Sasha Garvin while she was incarcerated at the Montgomery County Jail. Ms. Garvin complained of severe abdominal pain on May 17 and May 18, 2017. She described her pain as severe and rated it 10/10 on a pain scale on multiple evaluations by Montgomery County Jail personnel. She was evaluated by LPN's working for NaphCare. Greg Mills, LPN evaluated Ms. Garvin multiple times on May 18, 2017. Ms. Garvin requested that Mr. Mills have her transferred to the hospital for evaluation of her severe pain. This did not take place. Mr. Mills spoke with NaphCare physician, Brenda Ellis, M.D. by phone on May 18, 2017. Dr. Ellis did not personally come to the Montgomery County Jail to evaluate Ms. Garvin. In addition, she did not order Ms. Garvin to be transferred to an Emergency Department for evaluation of her severe abdominal pain and vomiting.

> After returning to the Montgomery County Jail from the Montgomery County Court House on May 18, 2017, Sasha Garvin again experienced severe abdominal pain and was again transferred to an observation cell where she was to have hourly checks by corrections officers. Montgomery County Jail documents demonstrate that hourly checks did not take place. There is no documentation of any physical checks occurring between 01:56 hours and 08:00 hours on May 19, 2017. Ms. Garvin was discovered to have died in her cell when corrections officers finally checked on her at approximately 08:14 hours on May 19, 2017.

Dr. Gabriel then included the following in opinions listed at the conclusion of his report:

> 6. Sasha Garvin required emergent evaluation in an Emergency Department, laboratory evaluation with a CBC, CMP, Lipase, Lactate, and UA. She required an emergent CT of the abdomen and pelvis with IV contrast to evaluate her abdominal symptoms. She required emergent evaluation by General Surgery and an emergency exploratory laparotomy.

> 7. Despite orders to evaluate Sasha Garvin hourly on May 19, 2017, she was not physically seen by a corrections officer between the

21

hours of approximately 01:56 hours and 08:00 hours. She was found deceased at approximately 08:14 hours. This represents a breach in the standard of care by employees of the Montgomery County Jail.

8. Sasha Garvin died of a surgically correctable small bowel obstruction with ischemic enteritis, and acute peritonitis due to a small bowel volvulus.

9. Based upon a reasonable degree of medical certainty, had Sasha Garvin been appropriately transferred to an Emergency Department on May 18, 2017, undergone appropriate CT scanning, lab testing, IV antibiotic therapy and emergent surgical intervention, she would have survived her abdominal catastrophe.

(Gabriel Report, at pp.3-4.) Dr. Gabriel's report expresses a reasonable degree of medical certainty and they are not mere conclusory opinions.

Dr. Gabriel, who has been an emergency room physician is aware of the kind of treatment that Sasha Garvin would have received in an emergency room had she been "appropriately transferred" as he believes the standard of care required. Unlike the expert physician whose report was rejected in *Davis*, 302 F. Supp. 3d at 959-61, Dr. Gabriel states both the "how" and the "why." Surgical intervention hours before her death arguably would have removed the blockage and arguably would have saved Garvin's life. The notion that Garvin, whose condition was "surgically correctable" would have received better medical treatment in an emergency room is not speculative. It is a reasonable conclusion drawn from the alleged facts, one that was drawn by multiple experts. Cf. *Paulk v. Ford*, 826 F. App'x 797, 804 (11th Cir. 2020).

Plaintiff's other expert witness, Dr. Bates, added, "It is my opinion within a reasonable degree of medical certainty, more likely than not, that had this [small bowel obstruction] been diagnosed early in the course of the disease, Ms. Garvin would have survived." He further states in his report, with respect to the care provided by NaphCare's Dr. Ellis:

> The physician totally abrogated her responsibility to the patient to persons who were unable to make diagnostic decisions. In her deposition, she answered the question about bowel obstruction in the following manner: "If I suspect a bowel obstruction—I would send them to the emergency room if I suspected that. I've treated numerous cases of bowel abdominal pain in my office, and it depends, case by case. It starts with the history, objective findings and assessment. Then part of the plan may be to get an abdominal x-ray or get a colonoscopy." More likely than not, Ms. Garvin would have survived had the doctor followed her own protocols.

(Bates Report, at 3.) Dr. Ellis's statement admits that an emergency room referral is the appropriate response to a bowel obstruction.

Additionally, neither of the physician experts retained by the Defendants has offered an opinion contradicting either Dr. Gabriel or Dr. Bates with respect to whether Sasha Garvin would have survived had she been transferred to a hospital on May 18. Cf. *Davis v. United States*, 302 F.Supp.3d 951. Neither NaphCare's experts nor the experts retained by the County Defendants offer any opinion on causation. They do not opine that Garvin's death was inevitable or that a transfer to an emergency room would have been in vain.  Thus, The NaphCare Defendants' motion will be denied regarding Plaintiff's medical malpractice, wrongful death, and survivorship claims.

**B.    Deliberate Indifference to a Serious Medical Need**

Defendants Sheriff Robert Streck and the Montgomery County Board of Commissioners join in the NaphCare Defendants' motion for summary judgment on Plaintiff's claim under 42 U.S.C. § 1983. To prevail on a cause of action under § 1983, a plaintiff must prove: (1) deprivation of a right secured by the Constitution or laws of the United States and (2) caused by a person acting under the color of state law. *Winkler v. Madison County*, 062618 FED 6, 17-6073; *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935,

23

941 (6th Cir. 2010)). Private medical professionals who provide health care services to inmates at a county jail qualify as a government official acting under the color of state law for the purposes of § 1983. Id.; *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008).

Because Garvin was being held for probation violation based on crimes for which she was convicted, it is not clear whether Garvin's claims should be evaluated under the Fourth Amendment, as a pretrial detainee, or the Fourteenth Amendment, as a pretrial detainee, or under the Eighth Amendment, for her prior convictions and the attendant probation violation. NaphCare argues that Garvin's claim for deliberate indifference must be evaluated under the Eighth Amendment because she was arrested for a probation violation based on crimes for which she was convicted, citing *Ford v. Grand Traverse*, No. 1:04-CV-682, 2005 U.S. Dist. LEXIS 51050, at *3, fn. 1 (W.D. Mich. Oct. 12, 2005).

In contrast, the County Defendants, in their brief, assert that Ms. Garvin was a pre-trial detainee and that her claims should be evaluated under the due process clause of the fourteenth amendment. (See Motion, at 11, Doc. 65, PageID 3220) ("Because Plaintiff asserts a deliberate indifference claims against a pre-trial detainee, his claim is analyzed under the due process clause of the Fourteenth Amendment)(also citing *Ford*).

It is well-settled that "the treatment a prisoner receives in prison and the conditions under which he [or she] is confined are subject to the scrutiny of the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Similarly, pretrial detainees are protected from cruel and unusual punishment by the Due Process Clause of the Fourteenth Amendment. *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018). These constitutional provisions protect incarcerated people from "deliberate indifference" to their serious medical needs. *Farmer*, 511 U.S. at 835. To

24

sustain liability under the deliberate indifference standard, a plaintiff must satisfy an objective component, which measures the seriousness of the medical need, and a subjective component, which measures the knowledge and actions of the defendants. *Id.* at 838–39; *Winkler*, 893 F.3d at 890. The defendants "must know of and disregard an excessive risk to inmate health or safety; the [defendants] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [they] must also draw the inference." *Id.* at 837.

Garvin was not found guilty of probation violations until her hearing on the afternoon of May 18, 2017. (See Parin Depo., Ex. 5, Risk Management Review Report, at 6, PageID 787.) Most courts classify individuals as a pre-trial detainee before that time. "Whether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an 'unresolved and difficult question." *Hill v. County of Montgomery*, No. 9:14-CV-933, 2018 U.S. Dist. LEXIS 88884, 2018 WL 2417839, at *2 (N.D.N.Y. May 29, 2018) (citations omitted). That court held that because the plaintiff had not yet had a hearing, nor had he been found guilty of the violation, his status was more akin to that of a pretrial detainee. Id. (citing inter alia *Chrisco v. Hayes*, No. 17-CV-72, 2017 U.S. Dist. LEXIS 187935, 2017 WL 5404191, at *4 (D. Colo. Nov. 14, 2017) (explaining that pretrial detainees included "'individuals awaiting trial on pending criminal charges and individuals awaiting adjudication on pending accusations that they have violated the terms of their probation or parole.'"); see also *Kravitz v. Cty. of Columbia*, No. 9:16-CV-1251 (GTS/ATB), 2019 U.S. Dist. LEXIS 82902, at *9 (N.D.N.Y. May 15, 2019).

The issue of whether a person confined during the pendency of probation violation proceedings should be treated as a pretrial detainee or a convicted prisoner for purposes of a constitutional challenge to jail conditions is an issue upon which courts have differed. See *Reinoso-*

*Delacruz v. Ruggerio*, 2019 U.S. Dist. LEXIS 78369, 2019 WL 2062434, at *2-3 (D. Conn. May 9, 2019) (inmate awaiting determination of probation violation proceedings considered a pretrial detainee for purposes of evaluating claim that jail officials failed to protect inmate from assault by a fellow inmate); *Chrisco v. Hayes*, 2017 U.S. Dist. LEXIS 187935, 2017 WL 5404191, at *4 (D. Colo. Nov. 14, 2017) ("Pretrial detainees include incarcerated individuals awaiting trial on pending criminal charges and individuals awaiting adjudication on pending accusations that they have violated the terms of their probation or parole.") (citations omitted); *Hill v. Cty. of Montgomery*, 2018 U.S. Dist. LEXIS 88884, 2018 WL 2417839, at *2 (N.D.N.Y. May 29, 2018) (status of inmate whose probation violation proceedings were pending "more akin to that of a pretrial detainee") (dictum; citing cases); *Weishaar v. County of Napa*, 2016 U.S. Dist. LEXIS 173833, 2016 WL 7242122, at *6-7 (N.D. Cal. Dec. 15, 2016) (jail inmate arrested for probation violation deemed to be a pretrial detainee for purposes of claim that jail officials failed to take measures to prevent inmate's suicide). Compare *Palmer v. Marion County*, 327 F.3d 588, 592-93 (7th Cir. 2003) (pre-Kingsley case noting "uncertainty" in the law but deeming issue "purely academic" because, at that time, the Eighth Amendment and due process standards were the same); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (admitting to "some uncertainty" on the issue).

Adding to the complexity of analysis, the Sixth Circuit had not yet decided whether the Fourth Amendment should be applied to a pretrial detainee's medical-based claim. *Esch v. County of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017). ("We have never squarely decided whether the Fourth Amendment's objective reasonable standard can ever apply to a plaintiff's claims for inadequate medical treatment."); *Boone v. Spurgess*, 385 F.3d 923, 934 (6th Cir. 2004) (noting the

uncertainty regarding whether the Fourth Amendment applies to inadequate medical care cases but declining to resolve the question). Id. at 514-515.

Regardless of the source, though, the right itself is well established. "[I]n 1992, [the Sixth Circuit] explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005); citing Heflin v. Stewart County, 958 F.2d 709, 717 (6th Cir. 1992).

The same standard is applied to a claim for denial of medical treatment brought by a pretrial detainee under the Fourteenth Amendment as is applied to a claim brought by a prisoner under the Eighth Amendment. *Brown v. Komidar*, 765 F.2d 144 (6th Cir. 1985). "[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

Here, Plaintiff's allegations are sufficient under either the Eighth Amendment and Fourteenth Amendment standards, or the Fourth Amendment standard.

### 1. Fourth Amendment Analysis

The Fourth Amendment reasonableness standard is a less stringent standard than that applied under the Fourteenth Amendment. *Smith v. Erie County Sheriff's Dep't*, 603 Fed. Appx. 414, 419 (6th Cir. 2015); quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001). To support a denial of medical care claim under the Fourth Amendment, a plaintiff must prove conduct that was objectively unreasonable under the totality of circumstances without the benefit of 20/20 hindsight. *Esch v. County of Kent*, 699 F. App'x 509, 515 (6th Cir. 2017).

> The objective reasonableness test requires courts to consider the reasonableness of an officer's actions in light of the totality of the

27

> circumstances, and from the perspective of a reasonable officer on the scene, rather than with the advantage of hindsight. *Darrah*, 255 F.3d at 307. Good intent does not mitigate unreasonable actions, as bad intent does not render reasonable behavior unconstitutional. *Dunigan* [*v. Noble*], 390 F.3d [486] at 493 [(6th Cir. 2004]. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006).

*Smith v. Erie County Sheriff's Dep't*, 603 Fed. Appx. at 419.

*Esch* held that four factors inform the determination of whether an [official's] response to a plaintiff's medical needs was objectively reasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment and (4) the police interests, including administrative, penological or other investigatory concerns. Id. at 515-516, citing *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007). A plaintiff must also show that the defendant's conduct caused the harm of which she complains.

Plaintiff's expert, Dr. Johnny Bates states in his report:

> The physician response in this case was totally inadequate, below the standard of care, and may have done more harm than good. The physician was deliberately indifferent when she did not act on the limited information provided by either sending the patient out or coming in and performing a more thorough investigation.

(Bates Report, at 3.) Under these circumstances a reasonable person arguably would have sent Garvin to the emergency room for evaluation.

Ohio law states that the standard of care for a medical care provider is to act as a reasonable provider would in providing medical care to the patient. Ohio Jury Instruction CV 417.03(1). See also *Hinkle v. Cleveland Clinic Found*., 159 Ohio App.3d 351, 372, 2004-Ohio-6853, ¶ 81, 823 N.E.2d 945, 960 (Ohio App. 2004). Thus, testimony as to the standard of care provides guidance

as to what a reasonable physician in Ellis' position would have done. Cf. *Williams v. Simpson*, No. 5:09-cv-31-R, 2010 U.S. Dist. LEXIS 132915, at *4-5 (W.D. Ky. Dec. 15, 2010) (doctor performed an examination of a plaintiff who exhibited symptoms consistent with life-threatening bowel problems and found the plaintiff to be malingering; when told later of worsening symptoms, the doctor eventually sent plaintiff to the hospital, where he received emergency surgery but died shortly thereafter). Id. In *Williams* the doctor was denied summary judgment, because an expert opined that when presented with plaintiff's history and symptoms, "the first consideration of the medical officers should have been a bowel obstruction or something similar." 2010 U.S. Dist. LEXIS 132915, at *6. As in *Williams*, Garvin began "vomiting and experiencing sharp pain in h[er] abdomen." Id. "These are classic signs of a bowel obstruction." Id. at *3. Unlike the physician in *Williams*, Dr. Ellis declined to examine Garvin at all, which is an indicium of deliberate indifference. (See Johnny Bates Report, at 3.)

Garvin had a medical history that made her particularly susceptible to developing a small bowel obstruction. Cf. 2010 U.S. Dist. LEXIS 132915, at *3. Garvin's medical history was ignored when she began to show signs of the bowel obstruction that eventually took her life. As in *Williams*, taking the evidence in the light most favorable to Plaintiff, the NaphCare defendants arguably ignored that Garvin's symptoms were "consistent with life-threatening bowel problems." Id. at *14.

### 2. Eighth Amendment/Fourteenth Amendment

The same standard is applied to a claim for denial of medical treatment brought by a pretrial detainee under the Fourteenth Amendment as is applied to a claim brought by a prisoner under the Eighth Amendment. *Brown v. Komidar*, 765 F.2d 144 (6th Cir. 1985). "[T]he due process rights

of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983). The standard for this analysis is as follows:

> A constitutional claim for deliberate indifference to serious medical needs requires a showing of objective and subjective components. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We have previously explained that "where a plaintiff's claims arise from an injury 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,'. . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899-900 (6th Cir. 2004) (citation omitted). In contrast, the subjective component requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F. 3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). Although the latter, subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," a plaintiff need not show that the officer acted with the specific intent to cause harm. Id. Indeed, "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" Id. (quoting *Farmer*, 511 U.S. at 836). Officials, of course, do not readily admit this subjective component, so "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." Id.

*Phillips v. Roane County*, 534 F.3d 531, 539-540 (6th Cir. 2008). A plaintiff must show that an official "knows of and disregards an excessive risk to inmate health or safety." *LeMarbe v. Wisneski*, 266 F.3d 429, 436 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "An official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. A plaintiff can also establish deliberate indifference "by a showing of grossly

30

inadequate care as well as a decision to take an easier but less efficacious course of treatment [or] . . . when the need for treatment is obvious [and] medical care . . . is so cursory as to amount to no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002).

A plaintiff need not show that the defendant acted with the very purpose of causing harm but must show something greater than negligence or malpractice, as the subjective requirement is designed to prevent the constitutionalization of medical malpractice claims. *Rouster v. County of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014).

*Williams v. Simpson* is instructive. In that case, the Court held that a prisoner with very similar symptoms of resulting from a small bowel obstruction met the two-part analysis allowing the claim to survive summary judgment. The *Williams* Court stated:

> Even without relying on the 'reasonable doctor' standard, the Sixth Circuit has established that the subjective requirement of indifference can be met if the symptoms are so bad that a lay person would recognize the serious medical need. *LeMarbe*, 266 F.3d at 438. Plaintiff has presented evidence that multiple lay employees at the prison thought that there was a serious medical need and this is strong circumstantial evidence of deliberate indifference by trained physicians. Additionally[…] deliberate indifference is present "when the need for treatment is obvious [and] medical care . . . is so cursory as to amount to no treatment at all[.]" *Terrance*, 286 F.3d at 843-44. In this case, Warfield had a cursory exam, was diagnosed as 'malingering,' and was then ignored for days as his symptoms persisted. Taking the facts in the light most favorable to Plaintiff, this is care so cursory as to amount to no treatment at all.

2010 U.S. Dist. LEXIS 132915, at *17-18.

Garvin never even received even a cursory exam from a physician. Plaintiff's Expert, Michael Berg, has specifically opined that "Ms. Garvin's health care needs were so obvious that

even a lay person would have easily recognized the necessity for the attention of a health care professional." (Berg Report, at 37.)

Defendants' description of Garvin's symptoms being similar to drug dependence and withdrawal are insufficient excuse to justify non-treatment at the summary judgement stage. Garvin's record shows that she has already been confined to the jail for over a week and had shown no signs of withdrawal, despite having been actively evaluated for them. (Rader Depo., at 44 PageID 3071.) Furthermore, drug withdrawal symptoms only last up to a week. (Parin Depo., pp. 57-58, PageID 752-53.) Indeed, NaphCare policy only requires monitoring of withdrawal symptoms for the first three days. (Ellis Depo., at 168, PageID 2120.) Attributing Garvin's suffering in this case to drug withdrawal is not supportable. See *Paulk v. Ford*, 826 F. App'x 797, 805 (11th Cir. 2020).

Dr. Bates states in his report:

> The most disconcerting part of this that leads me to conclude that the deliberate indifference standard is met is the comments section: "Crohn['.]s flare up according to inmate, just seen earlier with no complaints, now screaming and crying in N-21 stating that she needs to go to hospital for her Crohn's flareup. Placed on protocol and gave instructions on kite process at this time." The nurse, Greg Mills, was deliberately indifferent to patient's pain and suffering and acted below the standard of care. I have taken care of several patients through the years with bowel obstruction and one recurring theme was the severity of the pain they experience. In this case, her guts were literally twisted and strangulating which would lead to immeasurable pain. I have no doubt that her pain was a 10[.] Her autopsy revealed that she had 1,000 ml of fluid in her stomach pouch which would have had it been stretched to accommodate that amount of fluid. This, too, would have caused severe pain. The very least he could have done would have been to re-evaluate her as her complaints and wailing were clearly signs of extremis.

A jury could find that treatment of Garvin's pain prior to her death was so cursory as to amount to no care at all.

There is also sufficient evidence of subjective element in this case to prevent summary judgment, as to Dr. Ellis and Nurses Mills and Merkt, who were in charge of Garvin's care on May 18 and 19. It is the responsibility of NaphCare to check on patients in medical observation cells. (Depo. Mitchell, at 66 PageID 1844). NaphCare's policy states that patients placed in observation units are to be: "medically treated, monitored (i.e., vital signs every 30 minutes)." The last time Sasha Garvin's vital signs were taken were on May 18, 2017 at 5:07 a.m., that it 27 hours before she was found dead in her cell. Cf. *Kosloski v. Dunlap*, 347 Fed. App'x 177 (6th Cir. 2009). Thus, a jury could find that the care provided to Garvin "was so cursory as to amount to no care at all." Thus, summary judgment on Plaintiff's Section 1983 claim for deliberate indifference will be denied.

**C.     Unconstitutional Policy, Failure to Train, Supervise, or Discipline**

The standard for establishing a municipal liability claim under § 1983 is well established:

> A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. See *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A plaintiff can establish that a county, through the Board of Commissioners and Sherriff, is the proximate cause of a violation under any of five theories:

> (1) express municipal policy (*Monell*, 436 U.S. at 660-61),
>
> (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law" (*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation omitted)),
>
> (3) the decision of a person with final policymaking authority (*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986)),
>
> (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker ... can reasonably be said to have been deliberately indifferent to the [plaintiffs rights]" (*City of Canton v. Harris*, 489 U.S. 378, 390 (1989)), or
>
> (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright v. City of Canton*, 138 F.Supp.2d 955, 966.

*Bowles v. City of Mansfield*, No. 1:07-CV-2276, 2010 WL 3860938, at *5 (N.D. Ohio Sept. 30, 2010)

NaphCare, Inc. is no stranger to these claims:

> [A] private corporation acting under color of state law can be held liable under § 1983 only where an action of its employee taken pursuant to an official custom or policy caused the constitutional violation in question. Id. (citing *Thomas* [*v. Coble*], 55 F. App'x [748] at 749 [(6th Cir. 2003)]). The unlawful policy or custom must have been the moving force behind the constitutional violation.

> *Monell v. Dep 't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018,
> 56 L. Ed. 2d 611 (1978). Thus, NaphCare cannot be held liable for
> any deliberate indifference to plaintiff's serious medical needs by its
> employee unless the employee, by denying needed medical care to
> plaintiff, was acting pursuant to an official policy or custom of
> NaphCare and the policy or custom was the direct cause of the harm
> alleged.

*Buchanan v. Hamilton County Sheriff's Dep't*, Case No. 1:10-cv-503, 2012 U.S. Dist. LEXIS

182988, *15-16, 2012 WL 6761507 (S.D. Ohio Nov. 26, 2012); see also *Day v. DeLong*, 358 F.

Supp. 3d 687, 703 (S.D. Ohio 2019).

Two of Plaintiff's experts, Johnny Edward Bates, M.D., and Michael A. Berg, a

correctional expert, have identified policies that led to Garvin's death in this case. Dr. Bates

criticizes NaphCare's evidently widespread practice in which RN's and LPN's are permitted to

make differential diagnoses. (See Bates Report, at 4.) Michael Berg, in his report states:

> Given the vast number of General Order and Jail Manual Policy and
> Procedure failures in the Sasha Garvin death, it is clear that the
> training within the Montgomery County Sheriff's Office is
> extremely deficient. Policies must be trained and retrained until the
> administration is certain that their personnel understand. Clear
> policies and procedures and training are only effective if they are
> understood and the staff performance is reflective of a definite
> comprehension. Without this demonstrated proficiency, customs
> and practices will always prevail. Training in the correctional setting
> must be meaningful and specific on how to respond in every known
> situation, circumstance and condition.
>
> * * *
>
> NaphCare should also review their own policies and procedures and
> the training afforded these policies as the performance surrounding
> the Sasha Garvin matter was nothing more than despicable. Like the
> Sheriff's jail staff, this deficient performance is the direct result of
> poor training. Both the Sheriff's Office and NaphCare officials
> should have developed a performance review committee that
> continuously addressed performance failures and problems that
> were occurring at a frequent rate. Once identified policy changes

35

> should be made, training curriculums should be adjusted, and supervisory oversight increased. In an immediate response roll call training should be given and policy directive memos issued. These measures have historically not happened in the Montgomery County Jail as severe performance problems continue to occur over and over. This is not the only true with the performance problems evident in the Garvin matter, but also regularly happen in other Montgomery County Jail activities. Here too it doesn't take a medical degree to realize the failures of a health care provider's policies, supervision, and their treatment. Jail administrators must be attentive to all of these deficiencies.

(Berg Report, pp. 41-42.) Michael Berg opines that these deficiencies, particularly poor training, resulted in Sasha Garvin's death. "The clear failures of the Sheriff's Office and NaphCare were the cause of her death." (Berg Report, at 44.) "Montgomery County Jail and NaphCare administered to their clearly known responsibilities by using dangerous and life-threatening customs and practices of disregard that caused the unwarranted and preventable death of Sasha Garvin. It is completely inconceivable how this brutal and unthinkable event could have happened with all that is known today with respect to constitutional care, custody and control. (Id.) There is evidence that NaphCare and the County tolerated common practices of not taking patients' vital signs, inadequately performing well-checks, and not ensuring that detainees under medical treatment are returned to medical treatment after court appearances. Thus, a genuine issue of material fact exists as to whether an unconstitutional widespread practice was caused the violation of Garvin's constitutional rights, and the motions for summary judgment will be denied on this issue.

Additionally, a county is liable for any constitutional deprivations caused by the policies or customs of a contracted medical provider. *Ancata v. Prison Health Servs., Inc*., 769 F.2d 700, 705 (11th Cir. 1985). See also *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir. 1982)

(where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy). Because the Sheriff is the ultimate policy-making entity with regard to the Montgomery County Jail, the County, either in the person of the Sheriff or in the Board of Commissioners, is responsible for any policy either the Sheriff or NaphCare put in place. *Marcum v. Scioto County*, Case No. 1:10-cv-790, 2013 U.S. Dist. LEXIS 188503, *63 (S.D. Ohio Nov. 21, 2013). Thus, Plaintiff's claim against Sheriff Streck and the County Commissioners also survives summary judgment. *Day v. DeLong*, 358 F. Supp. 3d 687, 704 (S.D. Ohio 2019).

### B.  State-law Supervision and Breach of Fiduciary Duty/Negligent Hiring.

Plaintiff's Fourth Cause of Action in his Amended Complaint is a claim for breach of fiduciary duty against the NaphCare Defendants. Plaintiff's Fifth Cause of Action is a claim against NaphCare for negligent hiring, in particular, in regard to Dr. Ellis. Plaintiff has conceded that there is insufficient evidence in the record with respect to these claims for the claims to survive. PageID 3325. Summary judgment will be granted with respect to these claims.

### IV.   Motion to Quash

On December 20, 2021, five months after the Court held a status conference to ensure that discovery had completed by the court-ordered discovery deadline, NaphCare issued a subpoena to Plaintiff's expert, Johnny Bates. Plaintiff moved to quash. Doc. 82. Because NaphCare's subpoena was issued so far out of time, it will be denied.

### V.   Conclusion

Because Plaintiff does not oppose summary judgment on Plaintiff's fourth and fifth claims, summary judgment is **GRANTED** to against Defendants Ellis, Merkt, Mills, Mitchell, NaphCare and Rader on these claims. Because Plaintiff has evidence of deliberate indifference causing death

to an inmate at the Montgomery County Jail, Motion for Summary Judgment by Defendants Brenda Ellis, M.D., April Merkt, Greg Mills, Pamela Mitchell, R.N., NaphCare, Inc., and Darrell Rader, R.N., Doc. 64, and Motion for Summary Judgment by Defendants Montgomery County Board of Commissioners, and Robert Streck, Doc. 65, are **DENIED** in all other respects. Because discovery is closed, Plaintiff's Motion to Quash Subpoena Issued to Johnny Bates, M.D., Doc. 82, is **GRANTED**. The case remains set for trial on March 2, 2022 at 9:00 a.m. Final Pretrial Conference will be held in chambers on February 22, 2022 at 1:30 p.m.

       **DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, February 2, 2022.


                               s/Thomas M. Rose
                          _____
                               THOMAS M. ROSE
                          UNITED STATES DISTRICT JUDGE